

# NUMBER 13-13-00219-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

---

| | |
|---|---|
| LUMBERMENS MUTUAL<br>CASUALTY COMPANY, | Appellant, |
| v. | |
| NOE PORTILLO, | Appellee. |

---

## On appeal from the 398th District Court
## of Hidalgo County, Texas.

---

# MEMORANDUM OPINION ON REHEARING

### Before Justices Garza, Benavides, and Perkes
### Memorandum Opinion On Rehearing by Justice Benavides

We issued our original opinion in this cause on June 5, 2014. Appellee Noe Portillo filed a motion for rehearing. After due consideration, and within our plenary power, we *sua sponte* withdraw our previous opinion and judgment and substitute the following opinion and accompanying judgment in their place. *See* TEX. R. APP. P. 19.1.

Portillo's motion for rehearing is dismissed as moot.

In this judicial review of a worker's compensation award, appellant Lumbermens Mutual Casualty Company ("Lumbermens") challenges the twenty-percent impairment rating assigned to appellee Portillo. See TEX. LAB. CODE ANN. § 410.301 (West, Westlaw through 2013 3d C.S.). By two issues, which we consolidate into one, Lumbermens asserts that the evidence is legally insufficient to support Portillo's twenty-percent impairment rating.[1] We reverse and render.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

This case is before us for the second time. See Lumbermens Mut. Cas. Co. v. Portillo, No. 13-10-00470-CV, 2011 WL 2976869, at *1 (Tex. App.—Corpus Christi July 21, 2011, no pet.) (mem. op.). In the first appeal, we reversed the trial court's granting of Portillo's plea to the jurisdiction and remanded the case to the trial court for further proceedings consistent with our opinion. Id. at *3.

Portillo suffered a work-related injury to his lower back on July 26, 2001. Lumbermens is the insurance carrier that provided workers' compensation coverage in this case. During his treatment for the work-related injury, Portillo underwent spinal fusion surgery on his L4-L5 vertebrae and L5-S1 vertebrae on August 26, 2002. After Portillo reached maximum medical improvement[2] (MMI), Portillo's surgeon and treating

---

[1] Lumbermens's original two issues attack Dr. Guillermo Pechero's impairment rating report. By Lumbermens's first issue, it asserts that the trial court reversibly erred by admitting Dr. Pechero's report because it was legally insufficient to support the trial court's judgment. By its second issue, Lumbermens asserts that Dr. Harold Nachimson's ten-percent impairment rating was the sole valid impairment rating for the trial court to use as a matter of law in its judgment. Furthermore, Lumbermens briefs these two issues in a consolidated argument. Accordingly, we construe both issues as a challenge to the legal sufficiency of the evidence supporting the twenty-percent impairment rating.

[2] "Maximum medical improvement" is defined as the earlier of: (1) the earliest date after which, based on reasonable medical probability, further material recovery from or lasting improvement to an injury can no longer reasonably be anticipated; (2) the expiration of 104 weeks from the date on which income

physician, Guillermo Pechero, M.D., determined Portillo's permanent impairment to be at twenty percent and submitted his findings to the Texas Department of Insurance's Workers' Compensation Division[3] ("the Division"), the state agency charged with administering and operating the workers' compensation system in Texas. *See* TEX. LAB. CODE ANN. § 402.001 (West, Westlaw through 2013 3d C.S.).

Subsequently, the Division referred Portillo to its designated doctor, Harold Nachimson, M.D., for an additional examination and assessment. *See id.* § 408.0041 (West, Westlaw through 2013, 3d C.S.). After the examination, Dr. Nachimson concluded that Portillo had an impairment rating of ten percent. On November 5, 2003, Dr. Pechero wrote a letter to the Division that disagreed with Dr. Nachimson's impairment rating. Specifically, Dr. Pechero cited the Division's Advisory 2003-10, which allowed Portillo's impairment rating to be placed at twenty percent.[4] On December 30, 2003, citing Advisory 2003-10, Dr. Nachimson amended Portillo's impairment rating from ten percent to twenty percent. As a result, Lumbermens sought the opinion of an outside physician, James Obermiller, M.D.

---

benefits begin to accrue; or (3) the date determined as provided by labor code section 408.104 (providing an injured worker a method to extend the statutory period for maximum medical improvement following spinal surgery). *See* TEX. LAB. CODE ANN. § 401.011(30) (West, Westlaw through 2013 3d C.S.). Portillo's MMI date is not at issue in this appeal.

[3] The Division is formerly known as the Texas Workers Compensation Commission. For clarity, we will utilize "the Division" throughout this opinion, unless otherwise noted.

[4] Advisory 2003–10, and subsequently Advisory 2003–10B, (collectively "the Advisories") were issued by the Division in 2003 and 2004 as additional aids for doctors to use in evaluating a claimant's impairment rating. *See* TEX. WORKERS' COMP. COMM'N ADVISORY 2003-10 (July 22, 2003); Advisory 2003-10B (Feb. 24, 2004). The Advisories, however, were invalidated by the Austin Court of Appeals as an ultra vires act by the Division. *See Tex. Dep't of Ins., Div. of Workers' Comp. v. Lumbermens Mut. Cas. Co.,* 212 S.W.3d 870, 876–77 (Tex. App.—Austin 2006, pet. denied). Following the Austin Court's decision, the Texas Department of Insurance repealed the Advisories. *See DeLeon v. Royal Indem. Co.,* 396 S.W.3d 527, 528 (Tex. 2012) (citing TEX. DEP'T OF INS. COMMISSIONER'S BULL. No. 3–0033–07).

Dr. Obermiller opined in a January 19, 2004 letter that Dr. Nachimson's amended impairment rating was not in accordance with the statutorily-mandated AMA Guides to the Evaluation of Permanent Impairment (the "AMA Guides"), Fourth Edition. *See id.* § 408.124 (West, Westlaw through 2013 3d C.S.) (mandating that the Division shall use the AMA Guides for determining the existence and degree of an employee's impairment); *see also* 28 TEX. ADMIN. CODE 130.1(c)(2)(B) (2013) (Tex. Dep't of Ins., Div. of Workers' Comp.) (adopting the use of the AMA Guides, Fourth Edition for certifying examinations conducted on or after Oct. 15, 2001). Dr. Obermiller did not examine Portillo prior to issuing his opinion. After reviewing Dr. Obermiller's opinion, Dr. Nachimson wrote a letter to the Division stating that he concurred with Dr. Obermiller's opinion that according to the AMA Guides, Fourth Edition, Portillo did not qualify for a twenty percent impairment rating. However, Dr. Nachimson declined to change his twenty-percent impairment rating because he believed that the higher rating was mandated by the Division's Advisory 2003-10.

On August 26, 2004, pursuant to section 410.151 of the labor code, a contested hearing was held regarding Portillo's impairment rating. *See id.* § 410.151 (West, Westlaw through 2013, 3d C.S.). At the conclusion of the hearing, the hearing officer found Portillo's impairment rating to be twenty percent. Lumbermens appealed to the Division's appeals panel, *see id.* § 410.202 (West, Westlaw 2013, 3d C.S.), which affirmed the hearing officer's decision.

On April 7, 2010, Lumbermens sought judicial review of the appeals panel's decision through a bench trial in the 398th District Court of Hidalgo County, the trial court in this appeal. *See id.* § 410.301. At trial, the trial court heard arguments from counsel

4

and admitted several pieces of evidence, including: (1) Dr. Nachimson's ten-percent impairment rating report; (2) Dr. Pechero's twenty-percent impairment rating report; (3) Dr. Nachimson's deposition by written questions; (4) the AMA Guides, Fourth Edition; and (5) the Division's Advisory 2003-10 and Advisory 2003-10B.

The trial court signed a final judgment on January 18, 2013 that set aside the appeals panel's decision, but still assigned Portillo's impairment rating at twenty percent. Lumbermen filed a motion for new trial that was overruled by operation of law. This appeal followed.

## II.  STANDARD OF REVIEW AND APPLICABLE LAW

Under the Texas Workers Compensation Act, district courts review disputes involving compensability or eligibility for the amount of income or death benefits under a modified de novo standard. *See Rodriguez v. Svc. Lloyds Ins. Co.*, 997 S.W.2d 248, 253 (Tex. 1999) (citing TEX. LAB. CODE ANN. § 410.301; *Tex. Workers' Comp. Comm'n v. Garcia*, 893 S.W.2d 504, 515 (Tex. 1995)).

The party appealing bears the burden of proof by a preponderance of evidence. TEX. LAB. CODE ANN. § 410.303 (West, Westlaw through 2013 3d C.S.). In a bench trial, the court in rendering its judgment shall consider the decision of the appeals panel. *Id.* § 410.304(b) (West, Westlaw through 2013 3d C.S.). Furthermore, the opinion of the designated doctor regarding impairment is accorded no special weight. *Garcia*, 893 S.W.2d at 515. The evidence at trial shall be adduced as in other civil trials, and the facts and evidence from the Division's record are admissible to the extent allowed under the Texas Rules of Evidence. TEX. LAB. CODE ANN. § 410.306(a), (b) (West, Westlaw through 2013 3d C.S.). Evidence of the extent of impairment is limited to that presented

5

to the Commission unless the court makes a threshold finding that the claimant's condition has substantially changed. *Garcia*, 893 S.W.2d at 515 (citing TEX. LAB. CODE ANN. § 410.306).

An employee receives impairment income benefits according to the employee's impairment rating. *Rodriguez*, 997 S.W.2d at 253. The doctor expresses the rating as a percentage of permanent impairment to the whole body. TEX. LAB. CODE ANN. §§ 401.011(24) (West, Westlaw through 2013 3d C.S.), 408.124. To determine the impairment rating, an examining doctor evaluates the permanent effect of the employee's injury under statutory guidelines. *Id.* (citing TEX. LAB. CODE ANN. § 408.124); *see also* AM. MED. ASS'N, GUIDES TO THE EVALUATION OF PERMANENT IMPAIRMENT (4th ed. 1995) ("AMA Guides"). Furthermore, as discussed in Note 4 of this opinion, impairment ratings based upon Advisory 2003-10 or Advisory 2003-10B ("the Advisories") are invalid pursuant to the holding in *Texas Department of Insurance, Division of Workers' Compensation v. Lumbermens Mutual Casualty Co.*, 212 S.W.3d 870, 876–77 (Tex. App.—Austin 2006, pet. denied). *See DeLeon v. Royal Indem. Co.*, 396 S.W.3d 527, 528 (Tex. 2012) (citing TEX. DEP'T OF INS. COMMISSIONER'S BULL. No. 3–0033–07) (recognizing that the Texas Department of Insurance repealed the Advisories following the *Lumbermens* decision)).

## III. DR. PECHERO'S IMPAIRMENT RATING REPORT

As a threshold matter, we note that Lumbermens does not challenge Dr. Pechero's credentials, skills, or experience to provide an impairment rating under the Texas Workers' Compensation Act. Essentially, Lumbermens's issue on appeal is whether Dr. Pechero's twenty-percent impairment rating for Portillo amounts to "no evidence" due to

6

its unreliability, or, stated another way, whether the rating report is reliable and thus "some evidence" to support the judgment in Portillo's favor.

## A. Standard of Review

In considering whether an impairment rating submitted to the Division is valid, a reviewing court is not making a determination of impairment. *Am. Zurich Ins. Co. v. Samudio*, 370 S.W.3d 363, 368 (Tex. 2012). Instead, the court is deciding a purely legal question: whether the proffered rating was made in accordance with statutory requirements. *Id.*

Where the trial court admits expert testimony and the appellant challenges, on appeal, the expert testimony as constituting "no evidence," we consider whether the expert testimony is reliable under a de novo standard of review. *Mo. Pac. R.R. Co. v. Navarro*, 90 S.W.3d 747, 750 (Tex. App.—San Antonio 2002, no pet.). Generally, in determining whether there is no evidence of probative force to support the trial court's finding, we must view the evidence in the light most favorable to the verdict and must credit favorable evidence if reasonable fact-finders could and disregard contrary evidence unless reasonable fact-finders could not. *See Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 770 (Tex. 2010) (citing *City of Keller v. Wilson*, 68 S.W.3d 802, 822–27 (Tex. 2005)); *see also Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997). A no-evidence challenge will be sustained only if: (1) there is a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *City of Keller*, 168 S.W.3d at 810.

7

Less than a scintilla of evidence exists when the evidence is "so weak as to do no more than create a mere surmise or suspicion" of fact. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003) (internal citations omitted). More than a scintilla of evidence exists when the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Id.*

## B. Discussion

It is undisputed that only two impairment rating reports are before us in this appeal: Dr. Pechero's August 12, 2003 twenty-percent impairment rating report, admitted as Defendant's Exhibit 1, and Dr. Nachimson's ten-percent impairment rating report, admitted as Plaintiff's Exhibit 3.

### 1. Dr. Pechero's Report

The relevant portions of Dr. Pechero's impairment rating report state the following:

[Portillo] has been under my care for injuries sustained to the lumbar spine as a result of a work[-]related incident. Initial examination revealed some spasms and tenderness to the low back. [Portillo] was able to flex to the knees with reproducible back pain. Repetitive toe raises and heel walking were performed poorly secondary to pain. Negative [straight-leg raises] both in sitting and lying position. Neurological examination was intact. Sensation was intact. X-rays of the lumbar spine revealed degenerative disc disease with collapse of L4-L5 and L2-L3 with a lateral fusion at L2-L3 noted on the right. MRI of the lumbar spine and thoracic spine revealed bilateral fact hypertrophy at L5-S1, disc protrusion noted at a higher level and at T11-12 and a disc bulge with hypertrophy with spinal stenosis at L4-L5. [Portillo] at this time was not a surgical candidate due to multiple medical problems. [Portillo] reported that epidural injections and nerve root block injections did not help.

On follow up visits [Portillo] continued with pain and sensitization at L5-S1 nerve root down the left leg. He had decreased sensation consistent with an S1 nerve root. Weakness of the S1 nerve root. Decreased reflex at S1 bilateral. Weakness and instability to the lower extremities.

Subsequently [Portillo] underwent bilateral lumbar laminectomy with discectomy, foraminotomy bilaterally, posterior lateral fusion, with

8

instrumentation and harvesting of bone graft with bone marrow implantation and allograft bone graft, and revision of scar on 8/26/02. [Portillo] did as well as can be expected postoperatively. The patient attended work hardening and physical therapy programs. The patient was advised on conservative treatment.

In my opinion[,] the patient has reached MMI and range of motion testing was done using AMA Guides to the Evaluation of Permanent Impairment, 4th Edition. The patient was placed in the Lumbosacral Category IV: Loss of Motion Segment Integrity. The impairment assigned for Lumbosacral DRE is: 20%. In summary the final estimate of impairment is 20% WP.

On a separate page entitled "Lumbosacral Diagnosis Related Estimates," Dr. Pechero

wrote the following:

This patient was placed in Lumbosacral Category IV: Loss of Motion Segment Integrity

Discription [sic] and Verification: The patient has loss of motion segment integrity. Loss of motion segment or structural integrity is defined as at least 5-mm of translation of one vertebra on another, or angular motion at the involved motion segment that is 11 degree more than that at an adjacent motion segment. Loss of structural integrity at the lumbosacral joint is defined as at least 15 degrees more angular motion than at the L4 and L5 motion segment. A documented history of muscle guarding and pain is present. Neurologic abnormalities need not be present.

Structural inclusions: (1) Greater than 50% compression of one vertebral body without residual neurologic compromise; (2) multilevel spine segment structural compromise as with fractures or dislocations, without residual neurologic motor compromise.

The impairment assigned for Lumbosacral DRE is: 20%

Finally, on the last page of his report, Dr. Pechero included the following chart for Portillo

entitled "Lumbosacral Range of Motion":

| Movement | Description | Range | | |
|---|---|---|---|---|
| Lumbar Flexion | T12 ROM | 42 | 45 | 45 |
| | Sacral ROM | 11 | 10 | 11 |
| | True lumbar flexion angle | 31 | 35 | 34 |

9

| | | | | |
|---|---|---|---|---|
| | 10% or 5 degrees? | | No | |
| | Maximum true lumbar flexion angle | 35 | | |
| | % Impairment | 0% WP | | |
| Lumbar Extension | T12 ROM | 25 | 26 | 27 |
| | Sacral ROM | 10 | 11 | 10 |
| | True lumbar flexion angle | 15 | 15 | 17 |
| | 10% or 5 degrees? | Yes | | |
| | Maximum true lumbar extension angle | 17 | | |
| | % Impairment | 3% WP | | |
| Straight Leg Raising (SLR), Right | Right SLR | 40 | 41 | 42 |
| | 10% or 5 degrees? | Yes | | |
| | Maximum SLR | 42 | | |
| Straight Leg Raising (SLR), Left | Left SLR | 45 | 44 | 44 |
| | 10% or 5 degrees? | Yes | | |
| | Maximum SLR | 45 | | |
| Lumbar Right Lat Flexion | T12 ROM | 45 | 46 | 45 |
| | Sacral ROM | 12 | 12 | 10 |
| | True lumbar flexion angle | 33 | 34 | 35 |
| | 10% or 5 degrees? | Yes | | |
| | Maximum true lumbar flexion angle | 35 | | |
| | % Impairment | 0% WP | | |
| Lumbar Left Lateral Flexion | T12 ROM | 46 | 45 | 44 |
| | Sacral ROM | 12 | 12 | 12 |
| | True lumbar flexion angle | 34 | 33 | 32 |
| | 10% or 5 degrees? | Yes | | |
| | Maximum true lumbar flexion angle | 34 | | |
| | % Impairment | 0% WP | | |
| Lumbar Ankylosis in Lateral Flexion | Position | [Blank] | | |
| | % Impairment | 0% WP | | |

Lumbermens objected to the admission of Dr. Pechero's report on the grounds that it was unreliable because it was based upon the repealed Advisories rather than the AMA Guides. In the alternative, Lumbermens argued that, even if the Advisories were not expressly referenced, Dr. Pechero failed to establish how he reached his opinion of twenty-percent impairment rating, and the other evidence established that Dr. Pechero could only reach twenty-percent impairment through the application of the Advisories. We will address each argument in turn.

## 2. Analysis

10

We first note that Dr. Pechero's report does not mention or cite to the Advisories in reaching its impairment rating. To the contrary, several references are made in Dr. Pechero's report to the AMA Guides, Fourth Edition. The AMA Guides, Fourth Edition states that "two approaches" are used to evaluate spine impairments. *See* AMA Guides at 3/94. The first is known as the "Injury Model," also known as "Diagnosis-Related Estimates" (DRE), which assigns patients to "one of eight categories, such as minor injury, radiculopathy, loss of spine structure integrity, or paraplegia, on the basis of objective clinical findings." *Id.* The second is known as the "Functional Model" or "Range of Motion Model" which measures the degree of spine motion and assigns "impairment percents according to limitations of motion." *Id.* According to the AMA Guides, "[i]mpairment percents related to the range of motion were to be combined with percents based on diagnoses or therapeutic approaches and neurologic impairments." *Id.*

The AMA Guides list specific procedures and instructions for physicians to follow regarding the examination of a patient, the review of special studies, comparing the patient's findings with the criteria of impairment categories, and determining whole-person impairment using the impairment table. *Id.* at 3/101. According to the AMA Guides, lumbosacral spine impairments are described as "diagnosis-related estimates (DREs) and are [classified] in categories." *Id.* The whole-person impairment percents are based in categories designated I through VIII. *See id.*

DRE Lumbosacral Category IV: Loss of Motion Segment Integrity has a twenty-percent whole-person impairment and contains the following language:

> **Description and Verification:** The patient has loss of motion segment integrity (differentiator 5, Table 71, p. 109). Loss of motion segment or structural integrity is defined as at least 5 mm of translation of one vertebra

11

on another, or angular motion at the involved motion segment that is 11° more than that at an adjacent motion segment. (Figs. 62 and 63, p. 98). Loss of structural integrity at the lumbosacral joint is defined as at least 15° more angular motion than at the L4 and L5 motion segment.

A documented history of muscle guarding and pain is present. Neurologic abnormalities need not be present. If they are present, the examiner should consider using category V.

**Structural Inclusions:** (1) Greater than 50% compression of one vertebral body without residual neurologic compromise; (2) multilevel spine segment structural compromise, as with fractures or dislocations without residual neurologic motor compromise.

The AMA Guides explain "loss of motion segment integrity" in the following detail:

A motion segment of the spine is defined as two adjacent vertebrae, an intercalated disk, and the vertebral facet joints. Loss of motion segment or structural integrity is defined as abnormal back-and-forth motion (translation) or abnormal angular motion of a motion segment with respect to an adjacent motion segment.

The loss of integrity is defined as an antero-posterior motion or slipping of one vertebra over another . . . greater than 5mm for vertebra in the . . . lumbar spine; or a difference in the angular motion of two adjacent motion segments greater than 11° in response to spine flexion and extension. Motion of the spine segments is evaluated with flexion and extension roentgenograms.[5] Loss of integrity of the lumbosacral joint is defined as an angular motion between L-5 and S-1 that is 15° greater than the motion at the L-4, L-5 level.

. . . .

If the difference in motion, measured by flexion and extension films, between two angles . . . is more than 15° at the lumbosacral joint or more than 11° at any other joint, there is a loss of structural integrity.

The importance of careful and accurate roentgenographic studies cannot be overemphasized.

*Id.* at 3/98–99.

The AMA Guides further state that:

---

[5] "Roentgenograms" are commonly called x-rays. *See* ATTORNEY'S ILLUSTRATED MEDICAL DICTIONARY, R31 (Ida G. Dox et al. eds., 1997).

12

> If the physician cannot place a patient's impairment in one of the categories, or if there is disagreement about the most appropriate category, [the physician] should use the Range of Motion Model . . . to evaluate the magnitude of the impairment and identify the most appropriate category. . .

*Id.* at 3/109.

Lumbermens asserts that Dr. Pechero's report is "devoid of any analysis" to establish Portillo's twenty-percent impairment rating. We agree. If no basis for an expert's opinion is offered, or the basis offered provides no support, the opinion is merely a conclusory statement and cannot be considered probative evidence. *See City of San Antonio v. Pollock*, 284 S.W.3d 809, 818 (Tex. 2009).

Lumbermens points out that "while [Portillo's] injury involved L[4]–L5 and the L5–S1, there is no mention of roentgenograms that show 15° more angular motion in the sagittal plane of L5 and S1 than at L4 and L5 as required by [the AMA Guides]" to support Dr. Pechero's finding of "loss of motion segment integrity." Dr. Pechero's impairment rating report mentions that Portillo "has loss of motion segment integrity," and also notes that x-rays were taken of Portillo's lower back which revealed "degenerative disc disease." However, the report does not mention or cite any spine flexion and extension roentgenograms conducted on Portillo to show the requisite 15° more angular motion in the sagittal plane of L5 and S1 than at L4 and L5 as articulated by the AMA Guides.

Furthermore, Dr. Pechero's report contains a page entitled "Lumbosacral Diagnosis Related Estimates," which essentially restates the requirements for a Category IV impairment, without noting how it relates to Portillo's case. *See AMA Guides* at 3/102. Under title 28, section 130.1 of the administrative code, a doctor assigning an impairment rating must: (1) identify objective clinical or laboratory findings of permanent impairment

for the current compensable injury; (2) document specific laboratory or clinical findings of an impairment; (3) analyze specific clinical and laboratory findings of an impairment; (4) compare the results of the analysis with the impairment criteria and provide the following: (i) A description and explanation of specific clinical findings related to each impairment, including zero percent [ . . . ] impairment ratings; and (ii) A description of how the findings relate to and compare with the criteria described in the applicable chapter of the AMA Guides. The doctor's inability to obtain required measurements must be explained; (5) assign one whole body impairment rating for the current compensable injury; and (6) be responsible for referring the injured employee to another doctor or health care provider for testing, or evaluation, if additional medical information is required. The certifying doctor is responsible for incorporating all additional information obtained into the report required by this rule: (i) Additional information must be documented and incorporated into the impairment rating and acknowledged in the required report; (ii) If the additional information is not consistent with the clinical findings of the certifying doctor, then the documentation must clearly explain why the information is not being used as part of the impairment rating. 28 TEX. ADMIN. CODE § 130.1(c)(3) (2013) (TEX. DEP'T OF INS., DIV. OF WORKERS' COMP.).

Here, Dr. Pechero did not conduct an analysis under section 130.1(c)(3), but instead included the DRE Category IV "description and verification" and "structural inclusions" language. Furthermore, the record shows that Dr. Pechero conducted range-of-motion tests pursuant to the AMA Guides, Fourth Edition, but, again, Dr. Pechero made no reference to the findings from such tests in support of Portillo's assigned twenty-percent rating. *See* AMA Guides at 3/109. ("If the physician cannot

14

place a patient's impairment in one of the categories, or if there is disagreement about the most appropriate category, [the physician] should use the Range of Motion Model"). Without more support, such statements and findings cannot be considered as evidence in determining an impairment rating. *See Pollock*, 284 S.W.3d at 818.

Lumbermens next argues that Dr. Pechero's reference to Portillo's multi-level lumbar fusion surgery in his impairment rating report is "significant" because the AMA Guides, *see* AMA Guides at 3/100, state that surgery to treat an impairment does not modify the original impairment estimate, which remains the same in spite of any changes in signs or symptoms that may follow the surgery and irrespective of whether the patient has a "favorable or unfavorable response to treatment; however the Advisories state that "multilevel fusion meets the criteria for DRE Category IV." *See* TEX. WORKERS' COMP. COMM'N ADVISORY 2003-10 (July 22, 2003). As such, Lumbermens argues that any reference to Portillo's multilevel fusion to support the DRE Category IV twenty-percent impairment rating is unreliable, invalid, and thus no evidence.

We decline to read the AMA Guides as expansively as Lumbermens urges. Instead, we read the provision of the AMA Guides cited by Lumbermens narrowly as reference to surgeries that may take place after a patient's original impairment rating was estimated. *See* AMA Guides at 3/100. The AMA Guides' "General Approach and Directions" for impairment-category examiners states that a "physician should start with Table 70 (p. 3/108) as a guide toward the appropriate category for spine impairment." *Id.* Table 70 states that if a patient has a condition of "previous spine operation *without* loss of motion segment integrity or radiculopathy," the patient may meet the criteria for DRE Category II, III, or IV; and if a patient had a "previous spine operation *with* loss of

15

motion segment integrity or radiculopathy," the patient may meet the criteria for DRE Category III, IV, or V. *See id.* at 3/108 (emphasis added). Thus, reference to previous spine surgery in an impairment report is not unreliable per se under the AMA Guides, Fourth Edition. Nevertheless, in this case, Dr. Pechero made no reference to Table 70 of the AMA Guides in discussing Portillo's fusion surgery and supporting his twenty-percent assignment. Instead, Dr. Pechero's report appears to only cite the DREs. *See Am. Home Assur. Co. v. Poehler*, 323 S.W.3d 626, 631 (Tex. App.—Tyler 2010, pet. denied) (finding no evidence in the record that a doctor used Table 70 of the AMA Guides to reach an impairment rating).

Finally, Dr. Pechero's November 5, 2003 letter to the Division in disagreement with Dr. Nachimson's ten-percent impairment rating relies solely on the Advisories for support. Specifically, Dr. Pechero writes that under the Advisories, "multilevel fusion" surgery, like the one performed on Portillo, "is equivalent to 'multilevel spine segment structural compromise' per DRE IV, giving the patient [a] 20% [impairment rating]." It is undisputed that any reliance on the Advisories to support Portillo's twenty-percent impairment rating fails under *Lumbermens. See* 212 S.W.3d at 876–77.

In light of this record, we conclude that Dr. Pechero's report was unreliable and did not constitute probative evidence of a twenty-percent impairment rating. *See Pollock*, 284 S.W.3d at 818. Lumbermens established that Portillo's impairment rating of twenty-percent was not supported by legally sufficient evidence. Lumbermens's sole issue is sustained.

Because we hold that the evidence supporting the twenty-percent impairment rating was legally insufficient, the Division was presented with only one impairment rating,

16

the ten-percent impairment rating made by Dr. Nachimson. Thus, Portillo's impairment rating is ten percent. *See Poehler*, 323 S.W.3d at 632; *cf. Am. Zurich Ins. Co v. Samudio*, 370 S.W.3d 363, 368–69 (permitting a remand to the Division for further proceedings when the only impairment rating offered is invalid).

## IV. ATTORNEY'S FEES

After we issued the original memorandum opinion in this cause, Lumbermens filed a "Motion for Approval of Application for Attorney's Fees" in this Court with an attached affidavit by Lumbermens's counsel and billing records. In its motion, Lumbermens asked this Court to grant an order finding that its counsel's attorney's fees incurred related to this appeal were reasonable and necessary. *See* TEX. LAB. CODE ANN. § 408.222 (West, Westlaw through 2013 3d C.S.) (mandating that the amount of attorney's fees for defending an insurance carrier in a workers' compensation action must be approved by either the Division or "court," and determined by either the Division or court to be reasonable and necessary). On June 27, 2014 Portillo filed a response with the Court stating that he was unopposed to Lumbermens's motion.

On July 3, 2014, this Court issued an order of abatement and remanded the cause to the trial court for the limited purpose of holding a hearing to make a determination of whether Lumbermens's attorney's fees incurred on and between April 17, 2013 and June 9, 2014 (1) should be approved and (2) such fees were reasonable and necessary using the guidelines set forth in the labor code. *See id.* On July 21, 2014, the trial court held a hearing and granted Lumbermens's motion for approval of attorney's fees in the amount of $6,435.00, after finding that such fees were reasonable

17

and necessary in this case.[6]  Subsequently, we reinstated the appeal.  Because the trial court has disposed of Lumbermens's pending motion, and it is no longer at issue before us, we hereby dismiss it as moot.

## V.  CONCLUSION

Having sustained Lumbermens's sole issue, we reverse the trial court's judgment and render judgment that Portillo's impairment rating is ten percent.

GINA M. BENAVIDES,
Justice

Delivered and filed the
9th day of October, 2014.

---

[6] Portillo did not contest Lumbermens's motion for approval of attorney's fees.

18